UNITED STATES *v.* RALSTON, Adm'r, etc., and another.

*(Circuit Court, W. D. Virginia. September, 1883.)*

1. REVISION OF ACCOUNTS OF MARSHALS, CLERKS, AND COMMISSIONERS.

The appropriate comptroller of the treasury at Washington has the right to revise the accounts of United States marshals, clerks, and court commissioners after they have been approved by the judges of the United States courts, and to decide upon their validity; the judges having acted upon such accounts only in a ministerial capacity, and congress having by express statute given this power to the accounting officers of the treasury.

2. TRANSCRIPTS FROM TREASURY BOOKS—EVIDENCE.

Transcripts from the books of the United States treasury are competent evidence in trials of suits against officers of the United States, brought on their accounts; but they are *evidence* only; and it is in the discretion of courts and juries to give to them what weight they may deem proper in the trials in which the transcripts are used.

3. SERVICE OF WRITS—MILEAGE—REV. ST. § 829—ACT OF FEBRUARY 22, 1875.

Section 829 of the United States Revised Statutes, in those clauses which relate.to the mileage to be allowed to marshals for the service of judicial writs, is qualified by the final clause of section 7 of the act of February 22, 1875, (1 Supp. Rev. St. 147,) so that if a writ of arrest is issued in a criminal cause, and a writ of subpœna is issued at the same time in the same cause, for witnesses residing in the same locality with the accused, the marshal is entitled to but one mileage, his service of the subpœna not requiring another "actual and necessary" travel.

4. CRIMINAL CASES—SUBPŒNAS—NAMES OF WITNESSES.

Every subpœna in criminal cases for witnesses for the United States must contain the names of all witnesses in the same cause who reside in the same locality, and can be conveniently embraced in it; this, in order "to avoid unnecessary expense," as provided by section 829.

5. SAME—WITNESSES—REV. ST. § 877.

Under section 877 the witnesses above alluded to must be summoned to testify, not only in the cause in which the subpœna is entitled, but generally for the United States, "before the grand or petit jury, or both."

6. SAME—SUBPŒNAS, HOW ENTITLED — INFORMATION OF ACCUSED AS TO WITNESSES.

But section 877 should not be construed to forbid such subpœnas from being entitled in each cause in which the witnesses summoned under them are to testify; for if such subpœnas are issued generally, without reference to the cause in which the witnesses are especially wanted, the accused person has no means of learning with certainty who are the leading witnesses against him whom he is to confront at his trial, and the guaranty of the sixth article of the amendments to the national constitution is thereby rendered useless to him, in every case in which his ignorance as to who the leading witnesses of the prosecution are to be, works a surprise upon him.

Action for Debt. Decision of the court on the law and facts.

*D. S. Lewis,* U. S. Atty., for plaintiff.

*W. S. Lurty,* for defendants.

HUGHES, J. This suit was brought for the sum of $5,939.45, but subsequent allowances have reduced the amount claimed by plaintiff to $1,638.14. The defendants claim that the government owes the estate of the deceased marshal $1,301.70, the deceased having filed vouchers with the department at Washington showing that balance to be due him; but the officers of the treasury rejected items of claim to the amount of $2,940.44, which are set forth in two schedules—A and B—filed in the cause, and thus a balance is brought out against the deceased marshal of $1,638.74. The examination of these disallowed items is now the duty of the court, to whom all questions of fact are submitted by stipulation, as well as of law. Counsel of the government makes no objection to the allowance by the court of some of these items, now that explanations and proofs have been adduced at the trial which prove their correctness. Such items amount in aggregate to $381.97, and the amount really in dispute is, therefore, reduced to $1,256.77.

Before dealing with the items which constitute this sum in dispute, it may be remarked that the accounting officers of the treasury, under the direction of the comptroller, are undoubtedly empowered to revise the accounts of the district attorneys, marshals, commissioners, and clerks of the courts of the United States, and to reject items in

these accounts that have been audited and passed by the district judges of the United States. In passing upon the accounts of the these officers, the judges act merely in a ministerial capacity. Their allowances of such accounts are not judicial judgments, reversible only on judicial appeal. They are but little more than certificates of the regularity and genuineness of the accounts and vouchers, and are made by express law (section 846, Rev. St.) "subject to revision upon their merits" by the appropriate accounting officers of the treasury. This provision of law is not only wise and proper in itself, but benevolent to the judges, who are thus relieved of a very irksome responsibility and labor, which bring them into unpleasant antagonism with the officers of their courts. I will also remark as to the force and effect which are to be given to the transcripts from the books of the treasury department at Washington, which are filed in this and like causes. They are not *prima facie proofs* of the facts and statements which they contain, but are merely "evidence" competent to go before the jury and court for what they may be deemed by court and jury to prove. They are to be presumed to present facts, in the absence of contrary evidence, but are not to be accepted as outweighing evidence given under the two sanctions which constitute true legal evidence, viz., those of an *oath* given under opportunity of *cross-examination*. The language of the law of congress which makes them competent evidence in courts of justice, is, (section 886, Rev. St.:) "Transcripts from books of the treasury department shall be admitted as *evidence*, and the court trying the cause shall be *authorized* to grant judgment and award execution accordingly." The effect of this provision is to require that these transcripts shall be admitted as competent evidence in a trial, to be allowed such weight as the court and jury shall in each cause deem to be due to them.

Coming now to the disallowances which make up the amount claimed of the defendants in this suit, I will treat them by classes. There is a large class which consists of reductions of the number of miles charged by the deputy marshals in the distances traveled by them in serving process of the courts. Nearly all these reductions refer to mileages charged for travel in the counties of Franklin, Patrick, and Henry. I am at a loss to conjecture how as great distances as those claimed to have been traveled in the great majority of these cases could have been traveled. I am at liberty to take judicial knowledge of distances, and from a careful examination of the subject I think the department would have been justified in making even greater reductions of mileage than it has done in nearly all of these cases. The disallowances made of this class aggregate the sum of $340.48, and they must stand against the defendants.

There is a class of disallowances which were made on the ground that the items were put in the marshal's account for 1878, whereas they should have appeared in the accounts for 1877. No other ob-

jection is made to them; and, as such objection is merely technical, it should not avail in the trial of this case on its merits. I figure the amount of this class to be $195.34. They must be credited against the balance sued for in favor of the defendants.

Of like nature is a small amount of $2.90, due the marshal for his costs in a suit of the government on a post-office bond. The account should have been audited and paid by the post-office department, and there is no doubt that it is due. In this trial of the very right, I will allow this amount to the defendants, inasmuch as a jury would undoubtedly do so.

The rules of the department very stringently require the marshals to keep check-books, which themselves shall show the particulars of the marshals' disbursements. This marshal provided himself with the prescribed check-books, at a cost of $5.94, and charged the item in his accounts, which item was disallowed. He procured the books in discharge of an official duty, and I am clearly of opinion that the cost should be credited to the defendants.

There is a class of disallowances, or rather suspensions, of items of fees for services due the marshal in proceedings *in rem*, in cases where the goods seized did not, on being sold, produce funds to pay the costs of the proceedings. These were mere temporary suspensions, and not absolute disallowances. It is proved at this trial that the goods sold brought no funds to meet the costs paid by the marshal; and, inasmuch as he does not serve the government on contingent fees, the costs in such cases are due him, and the defendants here must be credited in the amount of them, which I find to be $42.42.

There is a class of items the allowance of which was suspended by the department until explanations should be made, and these were never made in consequence of the marshal's death. I have gone over them all, and heard and examined the evidence given at the trial in explanation and proof, and find that these explanations and proofs are sufficient to establish items of this class, aggregating $203.78, which sum must be credited to the defendants.

In the discharge of their duties as officers of internal revenue, John Walsh and others performed acts for which they were arrested and imprisoned under process from a state court. Proceedings were taken by the United States district attorney, in pursuance of the laws of the United States, for the release and exoneration of Walsh and his assistants. The marshal, under order of this court, paid the costs of these proceedings, and charged the amount in his accounts, which was $132.80. This item was suspended by the department for explanations. I find, on examination of the facts of the case, that the costs are correct, and that the marshal is entitled, under the law, to be reimbursed. They must be credited to the defendants in this suit.

There is a considerable class of disallowances, of which item 6, for the fall term of 1877, at Lynchburg, is an example. The disallowance is of mileage charged for the guards employed in transporting

prisoners from the place of arrest to the places of trial or imprisonment. The note of the department on this item is in these words:

"Suspended for evidence that the guard was actually so employed in each case; it being represented to this office that the marshal and deputies charge in every case mileage for guard whether actually employed or not."

It was perfectly competent and proper for the department, either on its own surmise or on the representation of others, to suspend these items for the reason assigned; and I have felt bound to consider carefully whether such a practice as that indicated was pursued by the marshal and his deputies. Affidavits and other evidence have been presented at the trial, which I think sufficient to remove the suspicion of fictitious charges for guards. If the practice did ever at any time obtain,—and I very much fear that it did,—I do not think, in view of the evidence presented to me, that it was pursued with respect to the items under consideration; therefore, I feel bound to allow the aggregate of this class of disallowances, which I find to amount to $718.70.

It is unnecessary, for the purposes of the present case, to consider a class of disallowances or suspensions of items made on the ground that the number of guards of prisoners employed by the deputy marshals on those occasions was excessive. In some of the cases the number employed seem to me, at this distance of time, to have been unnecessary; but I do not feel competent to judge with any confidence of that question; especially after the death of the marshal, and in view of the difficulty now of proving facts which occurred five or six years ago. The law, in providing that a necessary number of guards should be employed, seems to leave the determination in each instance to the deputy marshal. But this discretion is liable to abuse; and I think it is perfectly competent for the department to object to payment, and to call for proofs, where the number seems to have been disproportionately large. I pass over this question, as it is not necessary in the present case to render any formal judgment upon it.

I come finally to a large class of disallowances, of which item 46, on page 5 of Schedule A, is an example. It is in these words:

"Forty-two miles to Tazewell county, to serve subpœna in *U. S.* v. *Wallace*, disallowed, the same travel being charged to arrest in the same trip."

This is one of a large class of disallowances of like character shown in Schedules A and B, aggregating $674.12. The facts in this case were that the officer proceeded to Tazewell county, carrying a writ of arrest for Wallace, the accused person, and also a writ of subpœna for the witnesses for the government in the case. He charged mileage for serving the writ of arrest, and also mileage for serving the writ of subpœna; thus, though making but one journey, yet charging for two mileages. It was on this ground that the department rejected the charge of mileage in serving the subpœna. The ques-

tion for the court is whether the double mileage was due, and, more especially, whether the deceased marshal, who paid it in good faith to the deputy, ought to be credited with the rejected mileage in this suit. Up to the year 1875 there was no doubt of the right of the officer to this double mileage, and it was habitually allowed, both by the district judges and the accounting officers of the treasury at Washington. The provisions of law under which this allowance was made (section 829, Rev. St.) were as follows:

"For service of any warrant or other writ, etc., two dollars for each person on whom service is made. For travel, in going only, to serve any process, etc., including writs of subpœna in criminal cases, six cents a mile, to be computed from the place where the process is returned to the place of service, or, when more than one person is served therewith, to the place of service which is most remote, adding thereto the extra travel which is necessary to serve it on the others. * * * And, to save unnecessary expense, it shall be the duty of the clerk to insert the names of as many witnesses in a cause in such subpœna as convenience in serving the ꜱꜰꞏꞏ will permit."

On February 22, 1875, congress passed a law aimed at another object, but couched in the following general terms, (Supp. Rev. St. 147:)

"After the first day of January, 1875, no [marshal] shall become entitled to any allowance for mileage or travel not actually and necessarily performed under the provisions of existing law."

In view of this latter statute some question was made in 1876 as to the propriety of charges for doubtful mileage of the character I have indicated, as habitually made and allowed before its passage; and acting Attorney General Phillips, in an opinion given on the twenty-ninth of May, 1876, (15 Op. 108,) pronounced adversely to the practice; resting his opinion distinctly upon the act of 1875, and holding, virtually, that as the officer had made the journey for the purpose of serving one writ, he was, as to the other writ, entitled only to the fee for service, and not to mileage, for a journey which, as to that writ, he did not "actually and necessarily perform." This ruling does not seem to have changed the practice of charging and allowing double mileage of this sort, especially as Mr. Atty. Gen. Devens, in an official opinion dated on the tenth of October, 1878, (16 Op. 169,) reversed the ruling of Mr. Phillips, and held that the act of 1875 produced "no modification of the provisions of section 829, in so far as they fix the rate, determine the mode of computation, and limit the compensation of the marshal for the service of process;" and that the marshal "is entitled to full mileage on each writ served by him, when several issued in behalf of the government, to be served on different persons, are or might be served at the same time, though only one travel be necessary to make the service on all of said persons, where such travel is actually performed." In support of this view of the law, Judge BALLARD, of the district of Kentucky, made a similar ruling upon the accounts of Marshal R. H. Crittenden. See Ex. Doc. 1, part 3, Sp. Sess. 1881, p. 19. It was not until June

24, 1881, that this ruling of the attorney general was questioned, and it was then partially annulled by a decision of the first comptroller of the treasury, the Hon. William Lawrence, in which the comptroller held "that the marshal is entitled to but one mileage for all government witnesses served in one locality or direction at the same time, no matter how many writs of subpœna he may have, or what may be their form." Although this particular decision of the comptroller referred only to plural subpœnas for witnesses, it, in principle, embraces the disallowance 46, (cited above as an example,) and inhibits the charge for mileage in serving a subpœna in any case where, at the same time and in the same journey, mileage has been charged for serving a writ of arrest.

I am free to say that I entirely concur in the views of the honorable comptroller in the decision referred to, so far as it relates to double mileages in cases embraced by the terms of the act of 1875; and if the charges for double mileage now under consideration had been for services rendered since June, 1881, I should, without hesitation, disallow all duplicate charges of mileage for the same journey. But the comptroller, in his circular of August 10, 1881, based on his decision of the twenty-fourth of June, 1881, himself limited its enforcement to "accounts of marshals, clerks, and commissioners for services performed after June 30, 1881;" and I think, as he himself implies, that it would be unjust to give it an *ex post facto* operation.

The late marshal paid these double mileages on the faith of the previous practice in regard to them. It would be unjust to call upon him to refund them if he were alive. It would be doubly unjust to require his sureties to refund them, now that he is dead. These mileages were all paid before the end of 1878, three years before the decision was made which has now been applied to them. Looking at these disallowances as a jury would regard them, I find myself unable to concur with the department in applying to them its new ruling, and will credit them in this suit to the defendants. They amount to $674.14.

The aggregate of the several classes of disallowances which I have described, and which, I think, on the explanations and proofs submitted at the trial of this case, ought to be credited to the defendants, is $1,976. As this aggregate exceeds by several hundred dollars the sum sued for by the government, it follows that judgment must be entered for the defendants; which is done accordingly.

---

NOTE. Having, in the foregoing judgment, expressed my concurrence in the decision of the honorable comptroller of the treasury, of June 24, 1881, in the particular specified, I feel called upon to dissent from the construction which that officer puts, in another respect, upon section 877 of the Revised Statutes. That statute provides that "witnesses who are required to attend any term of a circuit or district court on the part of the United States, shall

be subpœnaed to attend generally on their behalf, * * * and under such process they shall appear before the grand or petit jury, or both, as they may be required by the court or district attorney."

Section 829 had provided, as before quoted, that "to save unnecessary expense it shall be the duty of the clerk to insert the names of as many witnesses *in a cause* in each subpœna as convenience in serving the same will permit."

The comptroller construes section 877 as "commanding the clerk, when witnesses on behalf of the United States, who reside in the same locality or direction of travel from the court, are required to attend at any term thereof, to issue for them one general subpœna, whether their testimony be needed before the grand jury or in a cause to be tried either by the court or the jury;" and as forbidding the clerk, in any case of the United States, "to elect between this statutory form of subpœna and the form which issues *as in a cause* pending in court."

I believe many of the courts give a similar construction to section 877, but not so strenuous a one as the comptroller; yet I think this construction is of very doubtful constitutionality and economy. The constitution of the United States (article 6 of the amendments) gives to every accused person the right, at the trial of the offense with which he is charged, to be confronted with the witnesses who testify against him in behalf of the government; and the English bill of rights of 1688, which is a part of our constitutional law, entitles every accused person to a list of the leading witnesses against him upon trial. But this constitutional guaranty would be a mockery if the prisoner and his counsel were deprived, by any novel or ingenious contrivance heretofore unknown to criminal procedure, of the means of knowing before the day of trial who the leading witnesses are whom he is to confront. This knowledge can only be derived with certainty from the subpœnas issued *in the cause*. It is true that the name or names of the witness or witnesses on whose testimony the indictment was found by the grand jury are written at the foot of the indictment. But it is rarely safe for the prosecution to go to trial with no other than the witnesses on whose testimony a *prima facie* case was made in the *ex parte* proceeding before the grand jury; and it is, moreover, the right of the prisoner to show from the record, before the trial, whether the witnesses who testified before the grand jury have been actually summoned. He can be certain as to the witnesses whom he is to confront only from the subpœnas issued, served, returned, and filed in the record of his particular case.

If section 877 is to be construed by the courts as it is construed by the comptroller,—and I admit some of them do act upon such construction,—it will be impossible for an indicted person to know beforehand, from the record which ought to show him, what witnesses are to testify against him.

He looks at the foot of the indictment for the names there, and then at the subpœna to see if those witnesses and what others have been actually summoned. If he finds that no subpœna at all has issued in the cause, he has a right to conclude that the case will not be tried at the coming term, and to avoid incurring the needless expense of summoning witnesses on his own behalf. At the term, however, when his case is called he finds that, under the new practice, witnesses are to appear against him of whom he knew and could have known nothing, and who have been summoned in an omnibus subpœna, containing all the names of witnesses who are to appear in any case, criminal or civil, for the government, in every cause on the docket, and who live in an entire county or tier of counties lying in any direction from the court. He is completely surprised, and his constitutional privilege of confronting witnesses whose testimony and character he might have successfully impeached, is reduced to a mockery. Suppose the trial to go on, and the prisoner tried under these disadvantages to be convicted; is there a court in all the land which would not, in every such case, set aside the verdict of the

jury as obtained by surprise?   I do not pretend that the prosecution is bound to disclose before trial all the witnesses whom the exigencies of the trial may render important, especially in rebuttal.   But I do hold that article 6 of the amendments requires the prosecution to show before the trial, by the record, who the leading witnesses are on whom it relies.

I do not consider, I cannot believe, that congress intended in section 877 to set aside the time-honored practice of issuing subpœnas in criminal prosecutions as in particular causes in which the witnesses summoned are to testify. It certainly does not in terms abrogate the ancient practice; and, inasmuch as section 877 does not do so expressly, and stands by the side of section 829, which requires as many witnesses *in a cause* to be put in the same subpœna as practicable, I do not think that, under the established canons of statutory construction, it can be construed to have that meaning.

I am convinced congress could have intended no more in section 877 than to require that, in all subpœnas issued on the part of the government, as many witnesses in the same cause as can conveniently be served with the same process shall be included; and that these witnesses shall be summoned to testify, not only in the cause in which the subpœna is entitled, but to testify generally for the United States, as well before the grand jury as the petit.   Section 877 I conceive to mean no more than to require in the subpœna, the usual form of which is here given, the addition of the words which are in the following form added in italics:

"[Indorsement.]      *United States* v. *Paul Jones.*

"SUBPŒNA—RETURNABLE FALL TERM, 1883.

"B—— G——, Clerk.

"[Face of the writ.]

"WESTERN DISTRICT OF VIRGINIA.

"*The United States of America to the Marshal of the Western District of Virginia, Greeting:*

"We command you to summon A., B., C., D., and E., if they shall be found in your district, to appear before our honorable judge of our district court of the United States, for the western district of Virginia, at the fall term thereof, to be holden at Abingdon, in the district aforesaid, on the twenty-third day of October, 1883, to testify, on behalf of the plaintiff, in a cause wherein the United States is plaintiff and Paul Jones is defendant, *and to testify generally for the United States before the grand or petit jury, or both;* and this you shall in no wise omit, under penalty of the law in that case made and provided; and have you then and there this writ.

"Witness the Hon. ALEXANDER RIVES, Judge," etc.

If the long-established practice of entitling each subpœna in a cause be not adhered to, and if all witnesses are summoned under general writs of subpœna, entitled in no cause,—writs heretofore unknown in criminal procedure,—then the courts will have to adopt new rules of practice to prevent surprise to accused persons, or else, in many cases of criminal trial, the work of courts, juries, and witnesses will go for nothing.

On the score of economy these general subpœnas are still more objectionable, especially in the western district of Virginia.   The largest criminal docket in this district is at Abingdon, where offenses are prosecuted which are committed in that exceedingly mountainous region of the state which is wedged in between the four states of North Carolina, Tennessee, Kentucky, and West Virginia.   Most of the offenses are committed by men who practice counterfeiting, or locate their illicit distilleries, or make illicit sales of liquor, close along the boundary lines of these states, where they can easily elude arrest by passing out of the jurisdiction of the court at the approach of

an officer. In a large proportion of the indictments, arrests of the accused persons cannot be made with any degree of certainty, and, consequently, when the terms of the court come on the docket is found to contain many cases in which the accused has not yet been found. My experience at the Abingdon court justifies the statement that in about one-fourth of the docketed cases arrests have not been made when the court is held, and I found the docket to contain in the fall term of 1882 about 375 criminal cases, and in the spring term of 1883 about 290 of such cases. There are, therefore, between 70 and 100 cases on the docket at each term in which the accused have not been arrested. There are also necessarily a good many other cases, in so large a docket, which, for one cause or other, require to be continued or are dismissed. It may well be imagined how many hundred witnesses attend at each stated term of the court when such dockets are to be dealt with. Suppose, therefore, at the beginning of the term the district attorney is engaged with the grand jury for the whole or greater part of the first week. All witnesses for the government, as well those to appear before the grand jury as those who are to appear before the court, have been summoned to the first day of the term; whereas, if the subpœnas had been issued in each case, the witnesses named in them could have been summoned for the second week of the term, and only those who had been recognized for the grand jury would appear on the first day. Summoned generally, as they are under the new practice, there is no way of ascertaining what witnesses of the dense cloud of those incumbering the court-room and the streets (many of them dependent on charity for their temporary support) are for the grand jury and what are for the court. They must all remain until the district attorney is released from attendance upon the grand jury, and has disposed before that body of the 50 or 100 cases sent up for presentment. When this officer is finally released from the grand jury and comes into court, the judge naturally goes rapidly through the docket in the first instance, for the purpose of continuing the hundred or more cases in which no arrests have been made, or which cannot be tried for other reasons. I did this last fall and repeated the expedient in the spring, in the hope of getting rid of the numerous witnesses who were to testify in the continued cases. But I found, to my disappointment, that but few if any witnesses could be identified for discharge in the cases continued after thus sounding and reducing the docket. No witness could tell the cause in which he was summoned, for he had not been summoned in any cause. Not a single subpœna could be produced to show that any particular witness was wanted in any particular case. The clerk had it not in his power to give certificates of attendance and discharge to any witness. They had been summoned in blocks or droves, by whole counties or tiers of counties, and the whole matter was, by deliberate contrivance, in a condition similar to that which printers' types are sometimes knocked into by accident, and which they call *pi*. There were but comparatively few cases in which witnesses did not have to remain in attendance until the docket had been gone through with; not only the witnesses who were actually examined, but those who would have been examined if the cases which were continued had been tried.

To save the six cents mileage of the marshal which would have been due if each subpœna had been issued in the cause for which the witnesses named in it were wanted, and a great number of whom would not have been summoned at all, where the writs of arrest had not been essential, an immense mass of witnesses, summoned in crowds for all cases, civil and criminal, in which the government was party, had to be paid their ten cents mileage and the *per diems* for their protracted attendance upon the court. It presented a signal example of the policy of " saving at the spigot and wasting at the bung-hole."

It will not do to say that the clerk should have inserted no names in the subpœnas, when they were issued, but of witnesses in cases which were cer-

tainly to be tried. How could that officer foresee what indicted persons would or would not be arrested? How could he foresee what cases would or would not be continued under the rules of criminal practice governing continuances? He can know nothing of these contingences when making out the omnibus subpœnas. The deputy marshals live at distances from the court, and cannot be advised with as to the accused persons who are or are not likely or certainly to be arrested. Reflection will teach that the evil is as completely beyond the district attorney's cure as the clerk's.

It is plain to me that the new practice is ill-advised and enormously expensive. I conceive that the ancient practice was far better and more economical, and that every subpœna should be entitled in the particular cause in which the witnesses named in it are wanted; that all the witnesses in that cause who reside in the same locality should be included in the same subpœna; that the subpœna or subpœnas in the same cause should be placed in the hands of the deputy marshal with instructions to first serve the writ of arrest, and not until after doing so to serve the subpœnas in that cause; and that each subpœna should run in the ancient and customary form, as in that cause, and should also contain, as required by section 877, a clause requiring the witnesses to testify generally for the United States "before the grand or petit jury, or both."

I believe with the great author of the Essay on Innovation, at least in matters of legal procedure, that it is better to stand upon the ancient ways—*stare antiquas vias*—than to depart rashly and radically from them.